

IN THE

# Court of Appeals of Indiana

Deonta Nelson,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Jul 16 2026, 9:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

July 16, 2026

Court of Appeals Case No.
25A-CR-2898

Appeal from the Marion Superior Court

The Honorable Marshelle Dawkins Broadwell, Judge

Trial Court Cause No.
49D07-2309-MR-25297

**Opinion by Judge May**
Judges Pyle and Scheele concur.

**May, Judge.**

[1] Deonta Nelson appeals following his conviction of murder.[1] Nelson presents one issue for our review, which is whether the trial court abused its discretion when it admitted surveillance footage. We affirm.

## Facts and Procedural History

[2] On August 28, 2023, Emily Willis, Dakota Brissom, Michael,[2] and Maria drove to a liquor store in Indianapolis to meet up with Nelson to obtain heroin. Nelson's Facebook profile identified him as "Tay Hoggin," (Ex. Vol. 1 at 127), and he was known as "Tay." (Tr. Vol. II at 167.) The arrangement called for Nelson to give heroin to Willis, and "if [Willis] chilled with him for an hour, then she wouldn't have to pay." (*Id*. at 184.) Willis obtained the heroin and gave it to Michael and Maria, who were experiencing heroin withdrawal symptoms. Brissom, Michael, and Maria left so that Michael and Maria could use the heroin, and Willis stayed behind "[t]o hang out with [Nelson] for an hour[.]" (*Id*. at 172.)

[3] Willis and Nelson then met up with others at a house on Rural Street. Raif Washington, who earned money by using his personal vehicle to provide transportation and run errands for other people, met Nelson and Willis at the house. While Nelson and the others were gambling with dice, Washington and

---

[1] Ind. Code § 35-42-1-1(1).

[2] The last names of Michael and Maria are not in the record.

Willis left the house "to drop some dope off" and pick up a pizza. (Tr. Vol. III at 13.) They returned to the house but then left again because Washington needed to go to a liquor store "to get some juice." (*Id*. at 14.) Willis stayed in the car while Washington went inside the liquor store, and when Washington came back outside, Willis was no longer in the car. Washington called Nelson to tell him what had happened, and Nelson was "[m]ad." (*Id*. at 16.) Washington went back to the house and picked up Nelson. Nelson called Willis on the telephone, and they found her outside the East Washington Street library branch.

[4] At around 8:30 p.m., Willis called Brissom. "She was paranoid, she was scared. She was frantic." (Tr. Vol. II at 174.) Willis told Brissom that a male individual "wanted her to get in the car and she didn't want to get in the car." (*Id*. at 175.) "[S]he said he had a gun[.]" (*Id*.) Brissom also heard a male voice "say over the phone that he had a gun." (*Id*.) Brissom advised Willis "not to get in the car" and "to run." (*Id*. at 176.) Willis told Brissom to meet her at the library. Surveillance footage from the east entrance of the library captured Willis on the phone yelling at Nelson and moving away from Nelson as he walked toward her. Eventually, Willis ran away from the library. Nelson got back into the vehicle, and Washington drove after Willis. Nelson called Willis "a couple of foul words" and said, "She got my money. I want my MF money." (Tr. Vol. III at 22.)

[5] Two juveniles were outside playing basketball down the street from the library. They saw a car pull up while Willis "was running down the sidewalk yelling,

'Leave me alone.' And someone stepped out at [sic] the passenger seat and shot her." (Tr. Vol. II at 195.) He shot her "about 20" times in rapid succession. (*Id*. at 198.) The juveniles ran to one of their houses, and a neighbor called 911. Other people in the area also called 911.

[6] Officer Jacob Kinnett of the Indianapolis Metropolitan Police Department ("IMPD") responded to the 911 calls and found Willis lying on the front porch of a house near where she had been shot. While Willis was receiving medical attention, Officer Kinnett repeatedly asked her who shot her, and Willis identified her shooter as "Tay" and "Tay Hoggins." (Tr. Vol. II at 145.) Shortly thereafter, Willis died. At around 9:00 p.m., Washington and Nelson drove into the parking lot of Colonial Apartments, the apartment complex where Washington lived, and the complex's surveillance footage captured Nelson and Washington getting out of the vehicle. Nelson stepped out of the vehicle from the front passenger side. He was wearing a red hoodie with a large object in the front pocket.

[7] IMPD Detective James Hurt was assigned to investigate Willis's murder. During that investigation, Detective Hurt identified Washington's vehicle as a suspect vehicle. The vehicle was registered to an address in the Colonial Apartments complex, and Detective Hurt found the vehicle parked in the complex's parking lot. Detective Hurt spoke with the management at the apartment complex, and the manager showed him surveillance footage from the night of the shooting. As Detective Hurt was watching the surveillance video, he saw Washington get into the vehicle and drive away. At some point, officers

stopped Washington's vehicle. Washington spoke with Detective Hurt following the traffic stop and identified Nelson in a photo array.

[8] On September 1, 2023, IMPD Sergeant John Burrello visited Colonial Apartments and recovered the surveillance video recorded from 8:58 p.m. to 11:58 p.m. on August 28, 2023. Detective Hurt also interviewed Nelson on September 1, 2023. After Detective Hurt repeatedly asked Nelson if he was present when Willis was shot, Nelson said, "I'll put it in place, bro, I was there, it's what it is, bro. Go on take me to jail, bro. Take me to jail, bro." (State's Ex. 29 at 1:45:31 to 1:45:36; Ex. Vol. 1 at 121.)

[9] On September 6, 2023, the State charged Nelson with murder.[3] The State later amended the charging information to allege Nelson was eligible for sentence enhancements because he used a firearm during commission of the offense[4] and he was a habitual offender.[5] The trial court held Nelson's jury trial beginning on September 23, 2025. At trial, Gregory Warren, a security officer for the Indianapolis Public Library ("IPL"), testified regarding the video surveillance system used at all IPL branches. He explained the surveillance video cannot be edited or altered, and he was not aware of any timing inaccuracies. Sergeant Burrello testified regarding his recovery of the surveillance video from Colonial

---

[3] The State also charged Nelson with Level 4 felony unlawful possession of a firearm by a serious violent felon, Ind. Code § 35-47-4-5(c), but the State chose to dismiss that charge after the first phase of Nelson's trial.

[4] Ind. Code § 35-50-2-11.

[5] Ind. Code § 35-50-2-8.

Apartments. He explained that the apartment complex utilized a Lorex-brand surveillance system, which is "an extremely common system" that Sergeant Burrello encountered "six or seven times a week." (Tr. Vol. III at 70.) He explained the footage recorded by the system could not be modified, altered, or edited. The system was "export only" and one "cannot remove a file and then put a different file back in." (*Id.*) Nelson objected to admission of the Colonial Apartments surveillance video and photographs of still images taken from the video on the basis that the State had improperly authenticated the exhibits, but the trial court overruled the objections. The jury found Nelson guilty of murder. Nelson chose to proceed with a bench trial on the firearm enhancement, and the trial court found the enhancement applied. Nelson then admitted the habitual offender enhancement applied to him. The trial court sentenced Nelson to a base term of sixty-four years for murder and enhanced that sentence by ten years because of the firearm enhancement and fifteen years because of the habitual offender enhancement, for an aggregate sentence of eighty-nine years.

## Discussion and Decision

[10] Nelson asserts the trial court abused its discretion in admitting the surveillance footage from Colonial Apartments and the still photographs taken from that footage. "We generally review a trial court's decision regarding the admission of evidence for an abuse of discretion. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and

circumstances before it." *Fisher v. State*, 264 N.E.3d 696, 704 (Ind. Ct. App. 2025) (internal citation and quotation marks omitted).

[11] Nelson argues the State failed to lay an adequate foundation for admission of the video and photographs under the silent witness theory. Indiana Evidence Rule 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "Photographs and videos can be authenticated through either a witness's testimony or, in instances in which no witness observed what a photograph or video portrays, the silent-witness theory." *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017). "In order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result." *Id*. The proponent of the evidence must show the video or photograph has not been altered in any significant way and, when relevant, the date and time the video or photograph was taken. *Id*. "If a foundational requirement is missing, then the surrounding circumstances can be used." *Id*. Surveillance footage is admissible under the silent witness theory "when there is testimony from someone with knowledge on the security system that produced the video or image, on the integrity of the system's process, and on whether [the] video or image was altered." *Stott v. State*, 174 N.E.3d 236, 246 (Ind. Ct. App. 2021).

[12]    Nelson notes that the State "chose not to call any employee from the apartment complex to testify regarding the apartment complex's surveillance system" and contends Sergeant Burrello's testimony was insufficient to authenticate the surveillance footage. (Appellant's Br. at 12.) However, Sergeant Burrello was very familiar with the Lorex system Colonial Apartments used. He testified that it was "an extremely common system" he encountered multiple times a week. (Tr. Vol. III at 70.) He also explained that the system was designed so that the footage it recorded could only be exported and not modified or altered.[6] Moreover, Washington's testimony regarding his actions and observations is circumstantial proof that the video was accurate. Washington testified that Nelson was wearing a red hoodie, that Nelson rode in the front passenger seat, and that he and Nelson drove to his apartment complex after the shooting. *See*, *e.g.*, *Edwards v. State*, 762 N.E.2d 128, 136-37 (Ind. Ct. App. 2002) (holding trial court did not abuse its discretion in admitting surveillance system video from a retail store when the clerk was able to independently describe defendant's activities depicted in the video), *aff'd on reh'g*, 768 N.E.2d 506 (Ind. Ct. App. 2002), *trans. denied*. Therefore, the trial court did not abuse its discretion when it admitted the Colonial Apartments surveillance footage and the still photographs of images from that footage. *See*, *e.g.*, *Flowers v. State*, 154 N.E.3d

---

[6] This testimony premised on Sergeant Burrello's personal knowledge regarding the characteristics and capabilities of the surveillance system itself is stronger evidence of authentication than the evidence proffered in *Irwin v. State*, where the State primarily relied on testimony from a police officer regarding what the landlord of an apartment complex told the officer about the landlord's actions and the system's characteristics to authenticate surveillance footage. 229 N.E.3d 567, 571-72 (Ind. Ct. App. 2024).

854, 870 (Ind. Ct. App. 2020) (holding police officer's testimony sufficiently authenticated surveillance video).

[13]     Moreover, even if the trial court erred in admitting the Colonial Apartments surveillance footage, any such error was harmless. Appellate Rule 66(A) provides:

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

Under Rule 66(A)'s probable impact test, "the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023). The test "is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented." *Id*. We focus on "the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case." *Id*. The error is harmless if its "probable impact is sufficiently minor when – considering the entire record – our confidence in the outcome is not undermined." *Id*.

[14]     Even without considering the Colonial Apartments surveillance footage, the evidence against Nelson was substantial. Willis identified her shooter as "Tay"

to Officer Kinnett multiple times before she died. (Tr. Vol. II at 145.) Nelson's Facebook profile listed his first name as "Tay," (Ex. Vol. 1 at 127), and Brissom testified Willis arranged to spend time with Tay in exchange for drugs. Washington made an in-court identification of Nelson as "Tay" at trial, (Tr. Vol. III at 5-6), and testified that Nelson shot Willis. The library surveillance footage showed Willis trying to get away from Nelson shortly before she was killed. Washington explained he was the driver and Nelson rode in the front passenger seat, and an eyewitness to the shooting described the shooter as exiting the passenger seat. The eyewitness also explained that Willis was trying to run away from the shooter before she was shot. Moreover, in his interview with police, Nelson acknowledged he was present when Willis was shot, and while he did not admit to shooting her, he did not identify anyone else as the shooter. Given the magnitude of evidence of Nelson's guilt, we are confident the outcome of the trial would have been the same even if the Colonial Apartments surveillance footage had not been admitted, and therefore, even if the trial court erred in admitting the footage, such error was harmless. *See*, *e.g.*, *Montgomery v. State*, 250 N.E.3d 478, 487 (Ind. Ct. App. 2024) (holding error, if any, in admission of evidence was harmless given the substantial independent evidence of defendant's guilt), *trans. denied*.

## Conclusion

[15] The trial court did not abuse its discretion in admitting the Colonial Apartments surveillance footage. In addition, even if admission of the surveillance footage

had been an abuse of discretion, any such error was harmless. Accordingly, we affirm the trial court.

[16] Affirmed.

Pyle, J., and Scheele, J., concur.

ATTORNEY FOR APPELLANT

Christopher Taylor-Price
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Daniel H. Frohman
Deputy Attorney General
Indianapolis, Indiana